**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**VINITA PRABHAKAR**,

**CASE NO.:**

Plaintiff,

v.

**FRED HAWKINS**, individually and in his official capacity as President of South Florida State College,
**SOUTH FLORIDA STATE COLLEGE DISTRICT BOARD OF TRUSTEES,**
**TERRY W. ATCHLEY**, in his official capacity as Chair of the South Florida State College District Board of Trustees, and
**DERREN J. BRYAN**, in his official capacity as Trustee of the South Florida State College District Board of Trustees,
**DEVON DONALDSON**, in his official capacity as Trustee of the South Florida State College District Board of Trustees,
**ALISON HANCOCK**, in her official capacity as Trustee of the South Florida State College District Board of Trustees,
**BO CONERLY**, in his official capacity as Trustee of the South Florida State College District Board of Trustees,
**JUSTIN FUSSELL**, in his official capacity as Trustee of the South Florida State College District Board of Trustees,

Defendants.
_____________________________________________/

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. College classrooms are supposed to challenge students. That is especially true in a college English course, where students learn to read critically, write effectively, and engage with literature that may be unfamiliar, difficult, uncomfortable, or even unpleasant. The First Amendment protects that process because it "does not tolerate laws that cast a pall of orthodoxy over the classroom," where truth is discovered not by "authoritative selection," but "out of a multitude of tongues." Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967) (cleaned up). This is because professors and their students "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Keyishian, 385 U.S. at 603 (*quoting, in part*, Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957)).

2. Plaintiff Vinita Prabhakar is an English professor who has devoted her career to teaching students how to read, write, and think. After teaching in the northeast for years, she began teaching at South Florida State College in 2023. Prabhakar also built her life in Florida for reasons that go beyond work. She moved here to be close to her elderly parents so she could help care for them. Her position at South Florida State College allowed her to engage with students while remaining near the family members who depend on her.

3. Then Plaintiff assigned a short story: Ottessa Moshfegh's *Bettering Myself*, a contemporary literary work by an award-winning author. Plaintiff used the story for a legitimate pedagogical purpose—to help students analyze narrative voice, tone, perspective, characterization, and style, including by comparing its female first-person narrator with male narrative voices from authors like Ernest Hemingway and Raymond Carver. Plaintiff has taught this story in her English classes for nearly a decade without incident.

4. One student expressed mild discomfort with the story. Plaintiff responded professionally, acknowledged that the story could be difficult, and invited classroom discussion. The student then attended class, participated in the assignment, and later told Plaintiff she understood college reading would require adjusting to more challenging material than she had encountered in high school.

5. That should have ended the matter. No class was disrupted. No student was forced to endorse any idea. And Plaintiff's academic supervisors supported her teaching, her professional judgment, and her use of *Bettering Myself* as an instructional tool.

6. But South Florida State College President Fred Hawkins intervened. Hawkins has no teaching or academic expertise in English literature. He did not identify any disruption to College operations. Instead, after reading the story, he objected to its content, said he would not want his own college-aged daughter reading it, told Plaintiff "I don't ever want to see this story again," and characterized the matter as "political."

7. The next day, the College suspended Plaintiff, removed her from the classroom, relieved her of her teaching responsibilities, and told her that her contract would not be renewed. When Prabhakar asked why, the Human Resources Director told her that "The President has the final say."

8. But at a public college, the First Amendment has the final say when it comes to terminating a professor for protected speech, like assigning a pedagogically relevant reading in class. *See*, Pernell v. Florida Board of Governors of the State University, Case No.: 22-13992, __ F.4th __, 2026 WL 1955783 (11th Cir. July 7, 2026); Bishop v. Aronov, 926 F.2d 1066, 1075 (11th Cir. 1991); Rankin v. McPherson, 483 U.S. 378, 383 (1987). Public officials, like Hawkins, may not suppress speech because they dislike the ideas it conveys or fear a reaction to it. Id.; *See, also*,

Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992).

9. South Florida State College's own policies recognize and promise faculty freedom to pursue and convey knowledge. Florida's Campus Free Expression Act likewise forbids public colleges from shielding students from ideas they may find uncomfortable, unwelcome, disagreeable, or offensive, and expressly protects faculty lectures, writings, and commentary. By suspending Plaintiff, removing her from the classroom, and terminating her because of a literary work she assigned in class, Defendants imposed the very "pall of orthodoxy" the First Amendment forbids.

10. Plaintiff brings this lawsuit to vindicate her constitutional and statutory rights, to return to the classroom, and to reaffirm a principle essential to higher education: public college administrators may not fire professors for teaching literature that challenges students to think.

## JURISDICTION

11. This suit is brought pursuant to 42 U.S.C. §1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

12. This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution and under 28 U.S.C. §1343(4) to secure equitable relief or other relief for the protection of civil rights.

13. The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

14. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. §1367.

15. The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

16. This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiff's rights, privileges and immunities under the Constitution of the United States and Title 42 U.S.C. §§1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

17. This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain policies and practices of the Defendants. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning the Defendants' actions taken under color and authority of "state" law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

## VENUE

18. Venue is proper in the Southern District of Florida, Fort Pierce Division. Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District and Division.

## THE PARTIES

19. Plaintiff Vinita Prabhakar (hereinafter "Prabhakar" or "Plaintiff") is an individual, *sui juris*, residing in Highlands County, Florida.

20. At all times material hereto, Plaintiff was a full-time faculty member in the Department of English & Humanities at South Florida State College ("SFSC").

21. Before her affiliation with SFSC, Plaintiff was an assistant writing professor at Ithaca College in New York. She relocated to Florida to help care for her aging parents and began teaching at SFSC as an adjunct professor. Plaintiff was hired on full-time at SFSC on August 14, 2023 and served continuously in that position until February 12, 2026, when she was suspended and advised that her contract would not be renewed.

22. At the time she was suspended and terminated, Plaintiff taught ENC1102, an introductory reading and writing course.

23. ENC1102 was part of the curriculum approved by the President of SFSC and the South Florida State College District Board of Trustees. The College lists the ENC 1102 course objectives, which are "to develop your ability to read literature critically and to improve your ability to write effectively" with the expectation that students will be "exposed to various literary genres. . . reading will include authors of both genders and a variety of multicultural backgrounds."

24. Plaintiff excelled at her job and was respected and well-liked by her peers and by her students. The SFSC Vice President of Academic Affairs invited her to serve as the Faculty Council President-elect with the expectation that she would be the President in the 2026-27 academic year.

25. Prior to the events complained of in this lawsuit, Plaintiff had never previously been subject to formal discipline during her tenure at SFSC or her previous teaching positions.

26. Plaintiff's work at SFSC represented not just a livelihood, but a career and a calling.

27. At all times material hereto, Defendant Fred Hawkins ("Hawkins") was and is the President of South Florida State College. Hawkins was the individual who terminated Plaintiff and

made the decision not to renew her contract based on objections to the content and viewpoint of Plaintiff's classroom instruction. Hawkins is sued in his official and individual capacities.

28. Defendant South Florida State College District Board of Trustees is the corporate and political entity which governs South Florida State College. *See*, §1004.65(1), Fla.Stat. ("Each Florida College System institution shall be governed by a district board of trustees under statutory authority and rules of the State Board of Education."); *see, also*, South Florida State College District Board of Trustees Policies – Policy No.: 2.02 ("("The South Florida State College (SFSC) District Board of Trustees is a body politic and corporate entity …. The Board has been given the legal responsibility and authority over the institution to carry out all powers and perform all duties provided for in the Florida Statutes (FS) and the State Board of Education Rules ….").[1]

29. Defendant Terry W. Atchley is a Trustee of the South Florida State College District Board of Trustees, serving as its Chair. In that capacity, Atchley presides over meetings of the Board of Trustees. Atchley is sued only in his official capacity.

30. Defendants Derren J. Bryan, Devon Donaldson, Alison Hancock, Bo Conerly, and Justin Fussell are the remaining Trustees of the South Florida State College District Board of Trustees and are sued only in their official capacities.

**COLOR OF STATE LAW**

31. As the President and Trustees of South Florida State College, Defendants are public officials. Defendants and their agents were, and are, acting under color of state law and authority.

32. Defendants' actions, taken under color of state law, violate Plaintiff's constitutional rights to engage in free speech as well as fundamental principles of academic freedom.

---

[1] Accessible on-line at https://www.southflorida.edu/wp-content/uploads/2014/10/POL2.02-SFSC.pdf (Last accessed 7/23/26).

## FACTUAL ALLEGATIONS

33. South Florida State College purports to support academic freedom:

A. The South Florida State College Faculty Handbook claims that SFSC faculty are "free to pursue and convey knowledge":

> I. Academic Freedom
>
> At South Florida State College, you are free to pursue and convey knowledge in your area of special training and expertise, subject to College, the state of Florida, and federal policies, procedures, law, and the code of ethics for professional educators (refer to SFSC Administrative Procedure 3011 – Academic Freedom).

South Florida State College Faculty Handbook 2025-26 (rev. Feb. 17, 2026), VII-I at 3. A copy of the South Florida State College Faculty Handbook is attached as Exhibit "1" to this Complaint. [2]

B. The College's Administrative Procedure 3011[3] adopts the 1940 Statement of Principles on Academic Freedom and Tenure formulated by the Association of American Colleges and the American Association of University Professors and claims that the College "is dedicated to the preservation of a college atmosphere which encourages freedom of expression on campus for faculty and students" and that "[a]ll members of the teaching faculty are entitled to academic freedom".

34. The words of the College do not match its deeds.

## PLAINTIFF'S CLASSROOM INSTRUCTION

35. Plaintiff's course curriculum for ENC 1102 was purposely challenging. Plaintiff's purpose and intent were to encourage students to fully develop their reading and writing skills

---

[2] The Faculty Handbook is also accessible online at https://www.southflorida.edu/wp-content/uploads/2025/10/Faculty-Handbook-2025-2026.pdf (last accessed 7/23/26).

[3] SFSC Administrative Procedure 3011 – Academic Freedom; accessible online at https://www.southflorida.edu/wp-content/uploads/2015/09/3011-Academic-Freedom.pdf (last accessed 7/23/26).

through exposure to English literature in all its myriad forms.

36. The SFSC Faculty Handbook and longstanding practice at SFSC encourage professors to make use of educational materials in addition to those appearing in approved textbooks. *See*, Faculty Handbook VI-A-1(f) (Suggesting that professors consider use of "Open Educational Resources (OER) as cost-effective alternatives when appropriate") and VI-A-2(b) (Allowing use of "alternate or additional texts with[ ] the permission of the instructional supervisor or dean.").

37. Plaintiff's syllabus - including use of specific materials to supplement the standard textbook - was approved by her instructional supervisor as contemplated by the Faculty Handbook (VI-A-2(b)).

38. One of the techniques Plaintiff used in her classroom to develop her students' reading and writing skills was to have them study and analyze works with a variety of narrative voices. Plaintiff found it pedagogically useful to have her students compare male and female narrative voices to get a sense of how vocabulary, viewpoint and tone might change depending upon the narrator. For what is generally considered to be a male voice, Plaintiff assigned reading from the works of Ernest Hemingway and Raymond Carver. For the female voice, Plaintiff often chose the short story *Bettering Myself* by the award-winning novelist Ottessa Moshfegh.[4]

39. Plaintiff considers *Bettering Myself* to be a useful instructional tool for her English class for multiple reasons in addition to the fact that it includes a female narrator:

[4] Moshfegh won the 2013 Plimpton Prize for Fiction for writing *Bettering Myself* and another story, *Disgust*. *See*, *The Paris Review*, March 26, 2013 "Ottessa Moshfegh Wins Plimpton Prize", accessible at https://www.theparisreview.org/blog/2013/03/26/ottessa-moshfegh-wins-plimpton-prize-j-d-daniels-wins-terry-southern-prize-for-humor/ (last accessed 7/23/26).

- The narrator immediately grabs the reader's attention because she is utterly unconventional, profane and dysfunctional, but also compelling in her own way.

- Presenting a deeply unsympathetic protagonist provides opportunities for critique and insight which students might miss with a more heroic or familiar narrator.

- The prose is contemporary and relevant to the lives of modern readers.

- Students compare the female first-person voice in *Bettering Myself* with the male narrator in *Cathedral* by Raymond Carver. The narrator in *Cathedral* is also unlikable; he is rude to his wife and a character who is blind. Students compare the narrative arcs between these two characters.

- The short sentences and terse story are reminiscent of Hemingway's style, but the subject matter and tone are completely different. Those stark differences provide an opportunity for in-depth discussion as students compare and contrast the authors and their perspectives.

- The story and subject matter are *meant* to be challenging. In a college setting, challenging materials take students out of their comfort zone, expose them to new ideas and provide opportunities for growth and intellectual maturation.

40. *Bettering Myself* also expresses a particular viewpoint: that all persons have intrinsic worth; that all individuals have the capacity to become better people; and that we should reserve a degree of pity and empathy when our sisters fail—as we all do to a greater or lesser extent.

41. *Bettering Myself* is a pedagogically appropriate piece of literature for a college-level English reading and writing program. The subject matter and prose of *Bettering Myself* is well within the approved curriculum for ENC 1102.

42. Other professors, both in Florida and around the nation, have assigned *Bettering Myself* to their students for these purposes and others. Plaintiff has used this story in her own teaching without incident for nearly a decade.

43. The text of *Bettering Myself* is attached as Exhibit "2" to this Complaint.

44. Plaintiff assigned *Bettering Myself* to the students of her Spring ENC 1102 class.

45. Students were expected to read the story and prepare "Reading Notes." Reading Notes were a graded assignment consisting of a 150-word minimum memorandum, either prompted by a list of suggested questions or by a perspective the student chose for herself.

46. On the evening of Monday, February 2, 2026, one of Plaintiff's students contacted the Plaintiff by e-mail to express some mild discomfort because of the subject matter contained in *Bettering Myself*. A paraphrasing of that communication follows:

> Prof vp - the story made me a bit uncomfortable. Do I have to do the reading notes for it?
>
> [Plaintiff's response] Hi , I agree this can be a challenging story; why don't we talk more about this in class tomorrow? 😊 Best, vp

47. The next day, Tuesday, February 3, 2026, the student appeared in class and participated in all associated in-class activities without incident.

48. Following class, Plaintiff went up to the student to ensure that the student remained comfortable with the classwork. The student responded (paraphrasing): "We don't read anything in high school. I know I'm in college now, and I have to get used to it."

49. Plaintiff reiterated that the student should feel free to discuss classroom assignments at any time. The student thanked the Plaintiff for her concern, and the class session ended unremarkably.

50. The student attended class as usual on Thursday, February 5, 2026. The student participated in all class assignments and discussions without incident and without expressing any issues with the subject matter, the course, or Plaintiff's teaching style.

**PLAINTIFF'S TERMINATION**

51. After class concluded on Tuesday, February 3, 2026, Plaintiff voluntarily contacted her Department Chair, Verna "Michelle" MacBeth, to advise her that a student had expressed discomfort about a class assignment.

52. On information and belief, the student who expressed discomfort spoke with another professor or an administrator at SFSC concerning the assignment of *Bettering Myself* in Plaintiff's class. It is not known whether the student actually complained about the assignment or merely discussed the fact that the work had been assigned reading.[5]

53. On information and belief, a professor or administrator – perhaps the individual contacted by the student or perhaps another – registered a complaint with SFSC administrators about the assignment.

54. South Florida State College has adopted policies and procedures for addressing complaints and grievances directed to faculty members,[6] which are codified as SFSC Procedure

---

[5] The Chairman of Plaintiff's Department, Verna MacBeth, sent a text to Plaintiff stating " "maybe the student didn't actually want to complain and maybe the student didn't authorize them [the staff member] to talk about this situation." Plaintiff has no information to the contrary.

[6] In the Florida College System, discipline of faculty members is the responsibility of each individual college and its Board of Trustees. *See*, §1001.64(18), Fla.Stat. ("Each board of trustees shall establish the personnel program for all employees of the Florida College System institution, including…. academic freedom and … disciplinary actions…").

1093 “Correcting the Actions of Faculty Personnel,” a copy of which is attached as Exhibit “3” to this Complaint.[7]

55. Those policies specify that complaints and grievances are to be addressed through the administrative hierarchy, beginning with the dean of the division, who is responsible for giving written notice of the problem requiring corrective action:

III. Procedure:

> A. The dean of the division of the faculty member will notify the employee in writing of a problem which may necessitate corrective action. Copies will be sent to the faculty member’s supervisor and the director, human resources. Based on consultation with the faculty member, the faculty member’s dean, the director, human resources, and/or any other appropriate College and/or non-College personnel, the dean will notify the faculty member in writing of the action (if any) being taken. Any corrective action taken must be consistent with College policy/procedure and State Board of Education regulations.

56. Procedure 1093 further envisions that the “normal steps that will be taken by the College in correcting a faculty employee’s behavior” consist of progressive discipline. That discipline usually begins with counseling with a “reasonable timeline for change.” *See*, Procedure 1093, II-C-1. Termination is reserved only for those instances where the violation is “serious enough in nature.”

57. Plaintiff was never provided with written notice of the complaint, or of any corrective action which might be taken, either before or after termination.

58. SFSC did not follow the specified procedures for discipline. Instead, the President, Defendant Hawkins, hijacked the process and terminated Plaintiff on his own initiative as alleged below.

---

[7] SFSC Procedure 1093 is also accessible on-line at https://www.southflorida.edu/wp-content/uploads/2015/09/1093-Correcting-the-Actions-of-Faculty-Personnel.pdf (last accessed 7/23/26).

59. Shortly before a regularly scheduled English Department meeting on Friday, February 6, 2026, Plaintiff received a text from Chair MacBeth stating that the issue with the student had "escalated," that "someone sent the story with the complaint and the president read it." The Chair opined at that time that "No one is in trouble, but it's gotta get dealt with."

60. Plaintiff met with Chair MacBeth prior to the department meeting and was advised that the Chair had met with the Dean of Arts and Sciences, Dr. James Hawker, and the Vice President for Academic Affairs, Dr. Michele Heston, to discuss the matter.

61. Chair MacBeth informed Plaintiff that Vice President Heston told the President – Defendant Fred Hawkins – that Plaintiff was "an asset to the department."

62. Chair MacBeth further informed Plaintiff that it was exceptionally unusual for the President to be involved in such a dispute, as there had been no formal complaint filed and because such matters usually proceed up the chain of command through the Department Chair, the Dean, and the Vice President.

63. The Chair requested (on behalf of Vice President Heston) that Plaintiff provide a written explanation for why she employed *Bettering Myself* in her classroom and how that lesson fit into the curriculum for that course. Plaintiff agreed to write such a statement for submission to the Chair, Dean, and Vice President by Monday, February 9th.

64. Later on that same day (February 6th), Plaintiff texted Chair MacBeth to thank her for her support. The Chair responded: "Of course! ... All your student SEI's [Student Evaluation of Instruction] say you are a wonderful teacher."

65. Plaintiff drafted a statement of the pedagogical rationale for assigning *Bettering Myself* in her English class and tendered it to the Chair. A copy of that written rationale is attached as Exhibit "4" to this Complaint.

66. The Chair responded to Plaintiff's rationale positively, indicating that she read the entirety of *Bettering Myself*, agreed that the story was "not intended for shock value," and opined that "[i]t is such an interesting literary device and way of showing characterization."

67. The Chair's response was sent to Dean Hawker and Vice President Heston as well. The Dean told Plaintiff that he shared the Chair's opinion that *Bettering Myself* was an appropriate pedagogical tool within the ENC 1102 curriculum.

68. On February 10, 2026, Plaintiff again met with Chair MacBeth and with Dean Hawker.

69. Dean Hawker informed Plaintiff that he and Vice President Heston had met with Defendant Hawkins and that the following conversations and actions took place:

A. Defendant Hawkins appeared intent on terminating Plaintiff immediately.

B. The Dean and Chair argued against termination based on Plaintiff's outstanding teaching evaluations, her contributions of the Department and College and the fact that Plaintiff was "not some political actor".

C. On information and belief, Plaintiff alleges that Vice President Heston provided Defendant Hawkins with printouts of case law supporting academic freedom and/or the First Amendment rights of public employees such as Plaintiff.

70. During the February 10th meeting with the Chair and Dean, Plaintiff asked for the opportunity to speak directly with Defendant Hawkins.

71. Chair MacBeth informed Plaintiff that a meeting had already been set for the following day.

72. Chair MacBeth further advised that she, Dean Hawker and Vice President Heston intended to offer a remedial plan to the President (Defendant Hawkins) that would include a limitation on Plaintiff's teaching to materials which appear in her textbook only.

73. Plaintiff advised the Chair that she was agreeable to such a limitation in the spirit of compromise.

74. Plaintiff met with Defendant Hawkins on Wednesday, February 11, 2026.

75. Also present during that meeting were Vice President Heston, Dean Hawker, Chair MacBeth and the Director of Human Resources.

76. Chair MacBeth opened the meeting by proposing a remedial plan under which Plaintiff would limit her teaching to the materials in the standard textbook. She also advised Defendant Hawkins that Plaintiff's syllabus had been approved by a colleague with the appropriate level of seniority consistent with the SFSC Faculty Handbook.

77. Plaintiff then spoke, describing her long teaching career, her love of her job and her students, and that she was not in the business of indoctrinating her students. She ended with an expression of remorse that her teaching assignment had generated any controversy.

78. The following colloquy then took place between the Plaintiff and Defendant Hawkins (paraphrasing):

> Defendant Hawkins: I'm not hearing anything except that you're disappointed no one came to you… Do you go to the Gen Ed meetings?
>
> Plaintiff: Yes, I go to all of them.
>
> Defendant Hawkins: Then why is this story on here?
>
> Plaintiff: I did write up a rationale for it -
>
> Defendant Hawkins: I read what you wrote. You don't teach this in your online class, why is that?

> Plaintiff: Because there is no opportunity for discussion. I wouldn't assign it if there couldn't be any discussion.
>
> Defendant Hawkins: Let me be clear: I don't ever want to see this story again. I have kids, I wouldn't want my daughter reading this, and she's in college.

79. Defendant Hawkins ended the meeting with the observation that "this is political."

80. After further consultation with Dean Hawker, Plaintiff returned to the President's office on the same day to again apologize and express her remorse for the controversy surrounding her lesson.

81. Defendant Hawkins met with Plaintiff and accepted her apology but noted that he had been in contact "with Tallahassee" about the matter as well as twice that day with Defendants, "the Board of Trustees."

82. On the following day, Thursday, February 12, 2026, Plaintiff taught her class as usual. The student who had expressed discomfort with the *Bettering Myself* assignment was in attendance as usual.

83. After class concluded, Plaintiff went to consult with Chair MacBeth.

84. During that meeting, the Director of Human Relations, Don Kesterson, tendered a letter, dated February 12, 2026, advising Plaintiff that she was immediately suspended with pay through the end of her annual contract. The letter further advised Plaintiff that she was relieved of her teaching responsibilities. The letter went on to advise Plaintiff that her annual contract would not be renewed. A copy of the February 12, 2026 letter is attached as Exhibit "5" to this Complaint.

85. The February 12, 2026 letter does not advise Plaintiff of the substantive basis for her suspension, her removal from the classroom, or the termination of her contract.

86. The February 12, 2026 letter does not advise Plaintiff of her due process rights and does not indicate that any administrative remedies were available to her.

87. Plaintiff immediately requested that the HR Director provide her with a copy of the formal complaint which led to her discipline, as required by SFSC Procedure 1093, III-A.

88. The HR Director responded that there was no written complaint and that the action had been taken on the basis of "a verbal complaint from a staff member."

89. When further pressed on the basis for the disciplinary action, the HR Director replied that it was because "You taught a story that wasn't in the textbook" and that "The President has the final say."[8]

90. The February 12, 2026 letter constitutes adverse employment action for all the reasons specified in the correspondence:

A. Plaintiff was immediately suspended;

B. Plaintiff was removed from her classroom and prevented from teaching;

C. Plaintiff was advised that her annual contract would not be renewed;

91. Defendant Hawkins made the ultimate decision to terminate Plaintiff.

92. Defendant Hawkins was acting under the authority of policies and procedures adopted by the Defendant South Florida State College District Board of Trustees and the Defendant Trustees named in this suit.

93. Defendants terminated Plaintiff solely because they objected to the content and viewpoint of Plaintiff's in-class instruction and for no other reason.

94. Defendants terminated Plaintiff solely because they objected to the content and viewpoint of the short story *Bettering Myself* and for no other reason.

---

[8] On a personal note the HR Director expressed his regret at Plaintiff's termination saying "My daughter really liked you when you were her Professor, and you get great evaluations."

95. Defendants' decision to terminate Plaintiff was not based on any good faith belief that Plaintiff's classroom instruction was at variance with the approved curriculum. Indeed, Plaintiff had secured approval for her syllabus and her OER materials, including *Bettering Myself,* from her instructional supervisor in accordance with College policies and procedures.

96. Defendants' decision to terminate Plaintiff was not based on any good faith belief that Plaintiff's classroom instruction lacked pedagogical value. As noted above, *Bettering Myself* is an award-winning story that is recognized as a useful piece of literature for instruction in college classrooms across the country.

97. At the time Plaintiff was terminated, SFSC had experienced no actual disruption in its operations and had devoted no money or resources to addressing any public fallout associated with Plaintiff's classroom instruction.

98. Defendants' decision to terminate Plaintiff was not based on any good faith belief that Plaintiff's classroom instruction would disrupt the ability of SFSC to function in the future, upset its ability to deliver state services, or lead to dissension among faculty, staff or students.

99. Even the student who initially expressed discomfort with the content of *Bettering Myself* completed the lesson and participated, without incident, in classroom discussions.

100. The administrators who were responsible for supervising Plaintiff and her department were unanimously supportive of Plaintiff's abilities as a professor and her pedagogical decision to use *Bettering Myself* as an instructional tool in her ENC 1102 English class.

101. Plaintiff continues to receive support and cordiality from her colleagues and students.

102. There is a direct causal connection between Plaintiff's classroom speech and Defendants' decision to terminate her employment.

103. Defendants violated Plaintiff's right of Free Speech and her academic freedom – an issue of special concern for our nation.

**DEFENDANT HAWKINS IS INDIVIDUALLY LIABLE FOR VIOLATING PLAINTIFF'S CONSTITUTIONAL RIGHTS**

104. Defendant Hawkins is Plaintiff's ultimate supervisor, and he is the individual who actually made the decision to terminate Plaintiff in response to Plaintiff's classroom instruction.

105. The only objections to Plaintiff's instruction raised by an administrator in a supervisory capacity were those of the President, Defendant Hawkins - an individual with no academic or teaching experience. Defendant's objections were not founded on any legitimate pedagogic concerns, but were based solely on the content of the materials taught; his personal belief that the content was morally objectionable (not suitable for his own daughter); and his fear that Plaintiff's instruction was somehow "political."

106. Hawkins has actual knowledge that Plaintiff was terminated solely because of his personal objections to the content of her classroom instruction.

107. Hawkins has actual knowledge that Plaintiff was terminated solely because of his personal objections to the particular viewpoint expressed in the material taught in Plaintiff's classroom.

108. The law is clearly established that, when a public employee is engaging in academic speech within a college or university classroom on a matter which is within the approved curriculum, the government cannot terminate the employee or retaliate against the employee based on the content or viewpoint of their speech. *See, e.g.*, Travers v. Jones, 323 F.3d 1294, 1295–96 (11th Cir. 2003), *citing* Rankin v. McPherson, 483 U.S. 378, 383 (1987) ("The law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech."); *Cf.*, Pernell v. Florida Board of Governors of the State University, Case No.:

22-13992, F.4th __, 2026 WL 1955783, at *4 (11th Cir. July 7, 2026) *quoting* Bishop v. Aronov, 926 F.2d 1066, 1075 (11th Cir. 1991) (affirming injunction of Florida's Stop WOKE Act as violative of "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment").

109. Even if the viewpoint-based discrimination at issue in this case does not categorically preclude any claim for qualified immunity, Pickering[9] balancing would lead to the inevitable conclusion that Plaintiff's discharge was unlawful.

110. Defendant Hawkins intentionally violated Plaintiff's First and Fourteenth Amendment rights for discriminatory and retaliatory purposes.

111. Defendant has actual knowledge that his termination of Plaintiff in retaliation for her academic speech was unlawful and in violation of Plaintiff's First Amendment rights.

## ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF

112. Plaintiff's free speech has been chilled now, and in the future, as she has been deprived of her very livelihood as a consequence of her speech.

113. Unless the actions, policies, and practices of Defendants are enjoined by this Court, Plaintiff will suffer the continuing loss of her constitutional rights.

114. Plaintiff has suffered irreparable injury and continues to suffer irreparable injury as a result of the Defendants' actions, policies, and practices.

115. Plaintiff will continue to suffer the violation of her First Amendment rights unless and until she is restored to her employment and position at SFSC.

[9] Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563 (1968).

116. Plaintiff does not have a plain, adequate, or complete remedy to protect her constitutional rights and to redress the wrongs and illegal acts complained of, other than injunctive relief.

117. Plaintiff does not have an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, monetary damages are inadequate.

118. The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendants, which interfere with the public's rights guaranteed under the First Amendment.

119. A permanent injunction will preserve Plaintiff's civil rights and will minimize the need to award extensive compensatory damages.

**DAMAGES AND ATTORNEY'S FEES**

120. Because of Defendants' actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated violations of her rights in the future.

121. Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

122. Plaintiff has retained Benjamin, Aaronson, Edinger & Patanzo, P.A. and the Foundation for Individual Rights and Expression as her attorneys to represent her in this action. Defendants are obligated to pay Plaintiff's attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT I**
**First Amendment Violation - Retaliation**

123. Plaintiff realleges the facts set forth in Paragraphs 1 through 13 and 15 through 122

and incorporates those facts into this Count by reference.

124. This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

125. Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

126. Plaintiff engaged in protected classroom instruction using pedagogically appropriate material within an approved curriculum.

127. Defendants took adverse action against Plaintiff – specifically, her discharge from employment, causing the loss of wages and associated benefits.

128. Defendant Hawkins had the actual authority to discipline Plaintiff, including her discharge from employment.

129. Defendants' actions directly deprived Plaintiff of her First Amendment rights.

130. Defendants' adverse action was in direct response to Plaintiff's protected academic speech.

131. Plaintiff's academic speech was the motivating factor in Defendants' decision to take retaliatory action against Plaintiff. Defendants terminated Plaintiff specifically because of their objections to her academic speech.

132. Defendants' response to Plaintiff's academic speech was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

133. Defendants' actions have chilled Plaintiff's speech.

134. Defendants' actions were based on their objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

135. Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A. That this Court take jurisdiction over the parties and this cause;

B. That this Court enter a judgment declaring that Defendants' termination of Plaintiff's employment violated the First Amendment because it was content-based;

C. That this Court enter a judgment declaring that Defendants' termination of Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D. That this Court enter a permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E. That this Court enter a judgment for front pay in the event reinstatement is not granted;

F. That this Court enter a judgment for compensatory damages against Defendant Hawkins, individually, to compensate Plaintiff for her lost wages and benefits;

G. That this Court award Plaintiff nominal damages against Defendant Hawkins, individually;

H. That this Court award punitive damages against Hawkins, individually, for his reckless disregard of Plaintiff's First Amendment rights and to deter him from violating Plaintiff's rights and other similarly situated employees in the future;

I. That this Court enter a judgment for pre-judgment and post-judgment interest against Defendant Hawkins, individually, at the highest lawful rate;

J. That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K. That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT II**

**First Amendment Violation - Content and Viewpoint Discrimination**

136. Plaintiff realleges the facts set forth in Paragraphs 1 through 13 and 15 through 122 and incorporates those facts into this Count by reference.

137. This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

138. Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

139. Plaintiff engaged in protected classroom instruction using pedagogically appropriate material within an approved curriculum.

140. Plaintiff's academic speech was and is protected by the First Amendment.

141. Plaintiff's interest in engaging in academic speech in a college classroom necessarily outweighs Defendants' interests in advancing content- or viewpoint-discrimination.

142. Defendants terminated Plaintiff's employment because of Defendants' opposition to the content and viewpoint of Plaintiff's academic speech.

143. Plaintiff's academic speech did not, in fact, disrupt SFSC's operations, which was known to Defendants.

144. Defendants cannot reasonably claim that Plaintiff's academic speech would upset the orderly operations of the SFSC, nor were such disruptions reasonably foreseeable given the

limited publication of Plaintiff's academic speech, the support of Plaintiff's students and co-workers, and SFSC's actual experience following Plaintiff's classroom instruction.

145. Public reaction to speech is never a content-neutral basis for regulation. *See*, Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

146. The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." Iancu v. Brunetti, 139 S. Ct. 2294, 2299 (2019); *See, also*, Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828–30 (1995) (Action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." Rosenberger, 515 U.S. at 829–30.

147. Defendants' decision to terminate Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

148. Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A. That this Court take jurisdiction over the parties and this cause;

B. That this Court enter a judgment declaring that Defendants' termination of Plaintiff's employment violated the First Amendment because it was content-based;

C. That this Court enter a judgment declaring that Defendants' termination of Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D. That this Court enter a permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E. That this Court enter a judgment for front pay in the event reinstatement is not granted;

F. That this Court enter a judgment for compensatory damages against Defendant Hawkins, individually, to compensate Plaintiff for her lost wages and benefits;

G. That this Court award Plaintiff nominal damages against Defendant Hawkins, individually;

H. That this Court award punitive damages against Hawkins, individually, to deter the Defendant from violating Plaintiff's rights and other similarly situated employees in the future;

I. That this Court enter a judgment for pre-judgment and post-judgment interest against Defendant Hawkins, individually, at the highest lawful rate;

J. That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K. That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT III**

**Violation of the Campus Free Expression Act**

**(Fla. Stat. §1004.097)**

149. Plaintiff realleges the facts set forth in Paragraphs 1 through 12, 14, 17 through 103, 112 through 119 and 122 and incorporates those facts into this Count by reference.

150. This is an action for damages and declaratory and injunctive relief for violation of §1004.097, Fla.Stat., the "Campus Free Expression Act."

151. Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the "Campus Free Expression Act."

152. Section §1004.097 of the Florida Statutes creates a private cause of action against colleges and other institutions of higher education which infringe upon the First Amendment right of professors and other individuals:

> (4) Cause of action. A person injured by a violation of this section may bring an action:
>
> (a) Against a public institution of higher education based on the violation of the individual's expressive rights in a court of competent jurisdiction to obtain declaratory and injunctive relief and may be entitled to damages plus court costs and reasonable attorney fees, which may only be paid from nonstate funds.

§ 1004.097(4)(a), Fla.Stat.

153. Section §1004.097 of the Florida Statutes creates substantive rights in favor of professors and others engaged in First Amendment protected activities and against colleges and other institutions of higher education which infringe upon their First Amendment right:

> (3) Right to free-speech activities.
>
> (a) Expressive activities protected under the First Amendment to the United States Constitution and Art. I of the State Constitution include, but are not limited to, any lawful oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus. Expressive activities protected by this section do not include defamatory or commercial speech. …
>
> (f) A Florida College System institution or a state university may not shield students, faculty, or staff from expressive activities.

§1004.097(3)(a), (b), Fla.Stat.

154. The Campus Free Expression Act prohibits a public university from denying students "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." §§1004.097(2)(f), (3)(f), Fla.Stat.

155. The Campus Free Expression Act expressly includes "faculty research, lectures, writings, and commentary" as among the sources of information that may not be restricted. §1004.097(3)(a), Fla.Stat.

156. The Campus Free Expression Act expressly includes a right to engage in expression consisting of "faculty research, lectures, writings, and commentary" without interference on the basis that the ideas conveyed may be upsetting or offensive to others. §1004.097(3)(a), Fla.Stat.

157. Plaintiff's academic speech was and is protected by the First Amendment.

158. Plaintiff's interest in engaging in academic speech in a college classroom necessarily outweighs Defendants' interests in advancing content- or viewpoint-discrimination.

159. Defendants terminated Plaintiff's employment because of Defendants' opposition to the content of Plaintiff's academic speech.

160. As a direct and proximate result of Defendants' actions as described above, Plaintiff is being deprived of her rights under the Campus Free Expression Act.

161. Plaintiff is entitled to a declaration that Defendant South Florida State College District Board of Trustees unlawfully restricted her right to engage in and disseminate academic speech and instruction protected by the First Amendment and by §1004.097(3), Fla.Stat.

162. Plaintiff is entitled to injunctive relief, including but not limited to, reinstatement and an order enjoining Defendant South Florida State College District Board of Trustees from interfering with her rights under the Campus Free Expression Act as those rights are irreparable injuries *per se*.

163. Plaintiff is entitled to an award of her costs and reasonable attorneys' fees paid from nonstate funds. *See*, §1004.097(4)(a), Fla.Stat.

164. Plaintiff has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her rights under the First and Fourteenth Amendments.

165. Without declaratory and injunctive relief from this Court, Defendants' unlawful actions will continue, and Plaintiff will suffer irreparable harm indefinitely.

WHEREFORE, Plaintiff prays for the following relief:

A. That this Court take jurisdiction over the parties and this cause;

B. That this Court enter a judgment declaring that Defendant South Florida State College District Board of Trustees' termination of Plaintiff's employment violates §§1004.097(3) and (4), Fla.Stat., the Campus Free Expression Act.

C. That this Court enter a permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

D. That this Court enter a judgment for compensatory damages against Defendant South Florida State College District Board of Trustees to compensate Plaintiff for those damages recoverable under §1004.097(3), Fla.Stat., the Campus Free Expression Act.

E. That this Court enter a judgment for pre-judgment and post-judgment interest against Defendant South Florida State College District Board of Trustees, at the highest lawful rate;

F. That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to §1004.097(4), Fla.Stat.; and

G. That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

GREG HAROLD GREUBEL, Esquire*
PA. Bar No. 321130; NJ No. 171622015
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
(215) 717-3473 / 717-3440 (Fax)
greg.greubel@fire.org

BENJAMIN, AARONSON, EDINGER & PATANZO, P.A.

/s/ Gary S. Edinger
GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440 / 337-0696 (Fax)
GSEdinger12@gmail.com

*Attorneys for Plaintiff*

* Pro Hac Vice Application Pending